# CHARLESTON.

## PAXTON *v.* PAXTON *et al.*

Submitted June 20, 1893.—Decided December 7, 1893.

1. WITNESS—TRUSTS AND TRUSTEES.

   A party, grantor and debtor, executing a deed of trust to secure a creditor is incompetent to testify that it was procured from him by false representation of the trustee, both trustee and creditor being dead. (p. 620.)

2. REVERSAL OF DECREE—ANSWER—REPLY.

   Under sections 35, 36, c. 125, Code, where an answer contains matter for affirmative relief, and no reply in writing is filed, but a general replication is entered, and the cause has been fully heard on such pleadings and proof, if the record shows that it is not such a case as would, before the passage of said sections, have made a cross bill necessary in order to give the defendant the relief sought by his answer, the decree will not be reversed for want of a reply in writing. (p. 623.)

3. REVERSAL OF DECREE—REPLY.

When, in such a case, defendant has taken depositions, and there has been a full and fair hearing on the merits, and substantial justice has been done, though there may be informality in not filing such reply, the decree will not be reversed for that cause. (p. 625.)

4. LACHES—DEMURRER.

Laches may be relied upon by a demurrer where the pleading demurred to shows the facts on which the defence of laches rests. (p. 625.)

5. WITNESS.

A grantor in a deed delivered to the grantee gives evidence after the death of grantee against his heirs that the deed was delivered upon a condition on the non-performance of which by the grantee it was to be re-delivered to grantor. The evidence is incompetent, both because the grantee is a garty to the suit and interested. (p. 628.)

C. HALL and O. JOHNSON for appellants:

I.—*Decree should be recorded for want of necessary parties.*— 11 W. Va. 427; 14 W. Va. 22; 15 W. Va. 190; 16 W. Va. 794; 21 W. Va. 2; Id. 124; 23 W. Va. 195; 33 W. Va. 155.

II.—*Answers of defendants have the force of cross-bills and pray affirmative relief.*—Code, c. 125, s. 36; 7 W. Va. 114, p't 1 Syll.; Id. 390, p't 1 Syll.; 8 W. Va. 218; 16 W. Va. 685; 17 W. Va. 276; 23 W. Va. 579. a. *The paper on p. 70 of the record purporting to be a special explanation is not recognized as filed by the final decree nor by any order entered in the cause and is no part of the record.*—16 W. Va. 777; 11 W. Va. 113; 12 W. Va. 688; 13 W. Va. 160; 16 W. Va. 522; 25 W. Va. 108; 26 W. Va. 49; Id. 710.

III.—*Laches not alleged nor relied on in the case and would not apply.*—24 W. Va. 574; 12 Am & Eng. Ency. L. 547 (n. 3); 26 W. Va. 807; 28 W. Va. 744.

W. A. McCORKLE, J. F. BROWN and T. B. SWANN for appellees cited 17 Gratt. 90; 1 Horr. 161, 189; 7 H. 819; 106 U. S. R. 391, 4 H. 561; 95 U. S. R. 200–37, H. 34; 99 U. S. R. 201–2; 16 Md. 390; 11 Md. 90; 5 Leigh 172; 2 Schols. & Spong. 607; 3 Bd. C. C. 633–4; Md. 257.

BRANNON, JUDGE:

Hays A. Paxton in his lifetime brought a suit, which

was afterwards revived in the names of his representatives, having for its object the partition among the heirs of his father, Thomas Paxton, of a tract of land in Clay county. The said Thomas Paxton had nine children, so that the land was divisible into nine shares, though several had sold to co-heirs. The only persons contesting the partition on the basis of such heirship were George W. Paxton and Thomas Samples, who claimed to be joint owners of the whole and denied that the land was partible as belonging to Thomas Paxton's estate among his heirs. A decree for such partition having been rendered by the Clay county Circuit Court, George W. Paxton and Samples took this appeal.

The bill alleges that Thomas Paxton had a debt against George W. Paxton and Thomas Samples, made up of ten bonds for one hundred and fifty dollars each; and that they executed a deed of trust to John Paxton, trustee, to secure it upon said land; and that under said deed of trust the trustee after the death of Thomas Paxton sold the land; and that William Paxton who was administrator of Thomas Paxton and also a child and heir, purchased it for the benefit of all the heirs and conveyed it by deed to said heirs. This land was conveyed in 1855 by William Vinyard to George W. Paxton and Thomas Samples. George W. Paxton was a son, and Samples a son-in-law, of Thomas Paxton. It is clear that Thomas Paxton paid for this land by the conveyance to Vinyard of lots in Spencer, and it is claimed that George W. Paxton and Samples held it in trust for Thomas Paxton, and much matter is brought into the case relative to that feature; but I discard it as irrelevant, since later the deed of trust was given, and the parties treated it as the property of George W. Paxton and Samples for the purposes of that deed of trust; and besides, the case made by the bill is such, and the title to the land is traced to that deed of trust, and the right to partition is based, not on a trust in the original conveyance from Vinyard, but from the deed of trust. The whole case turns on the question whether George W. Paxton and Thomas Samples gave that deed of trust. They deny it. Let us look at some of the circumstances pertinent to this decisive question.

The bonds of George W. Paxton and Thomas Samples ' to Thomas Paxton are produced, bearing the same date with the deed of trust, 21st March, 1855. They are described in the deed of trust. That is a circumstance favoring the genuineness of the deed of trust. The obligors in said bonds admit they made them. George W. Samples says they had no relation to the purchase of the land, intending thereby to repel the idea that he and Samples had purchased of Thomas Paxton, alleged by some as the explanation of the bonds. What if they had no relation to the land, if secured by deed of trust? No matter whether they were for purchase of the land or not.

William Paxton states that he saw this deed of trust, had it in his possession, and the signatures were in the handwriting of George W. Paxton and Thomas Samples, and that they both told him at different times that they had signed the deed of trust and bonds.

Amanda E. Parks states that she heard a conversation between George W. Paxton and the wife of Samples, in which Paxton asked Mrs. Samples why her husband had signed the deed of trust and bonds, when she asked him why he had himself signed them, and he replied that it did not matter why he had signed them; and heard Hays Paxton advise him to drop this litigation, as he had signed the deed of trust and bonds for the land, and George W. Paxton said it did not matter about his signing them.

Against this evidence showing that George W. Paxton executed the deed of trust, there is none save that of himself, and it is overruled in weight by two witnesses, and, besides, is inadmissible—Thomas Paxton being dead—by Code, c. 130, s. 23.

Another strong circumstance against George W. Paxton's claim is that by deed of October 14, 1874, he conveyed to Hays A. Paxton all his right in "one undivided ninth part of one thousand four hundred acres," conveyed to him and Samples by Vinyard. Now, as heir, he would own one undivided ninth; just that. It is a circumstance that he claimed then only that. Several witnesses say that he afterwards said that he owned no interest in the land, as he had sold all his interest to his brother Hays. Again if

he owned half, why did he pay just one ninth of the taxes on the land for the year 1869 and a number of years thereafter, as he did? George W. Paxton, in his first answer, admitting the bonds mentioned in the trust, set up a debt of at least six hundred dollars against his father; but in a subsequent answer says it was inserted in the answer without his knowledge, and that his father owed him nothing. His plans had changed.

In addition to the above evidence of William Paxton as to the signature of Samples to the deed of trust, and his admission of its execution, there is abundant other evidence to prove it as to Samples. He said in presence of Amanda E. Parks that he had signed and acknowledged the deed of trust. In fact he does not deny, but admits, in his answer, and in his labored evidence, that he did sign it. But he says that he was a soldier, and when at home on furlough, in 1864, John Paxton presented a paper to him to sign, which he did not himself read, Paxton representing that it would "put the land to rights" if anything happened to Samples in the army; and he signed it, as he thought, to secure his wife the land if he should be killed in the war; that George W. Paxton would cheat him out of his share, and he signed it to save the land. This story is very improbable. He had a deed on record from Vinyard conferring on him half of the land. How could his wife lose her interest should he be killed? How could George W. Paxton get the whole of the land? Why did he sign a paper without reading it? He then, in the same deposition, says, "I did not see, hear or know of such a paper being in existence before March 3, 1866." But he knew its contents that day, and why did he on that day appear before the recorder of Clay county, and solemnly acknowledge it? He does not pretend that it was then misrepresented, or that he did not know its contents. He surely had opportunity to know them.

Again, John Paxton is dead, and the plaintiff and other heirs claim under him as alienees, and Samples gives this evidence being a party to the suit in his own interest against such alienees. It may be inadmissible, too, because Thomas Paxton is dead, the question being whether Sam-

ples made a deed of trust to him. The deed importing that he did, allowing Samples to state he made it to John Paxton under false representations tends to show he did not execute it to Thomas Paxton, the deed of trust creditor. If Thomas Paxton were alive, he could speak on the question, and deny that Samples made the deed to the trustee; and as he is dead, the law may exclude Samples. The trust purports to have been made with the creditor as an express party. This evidence tends to show it was not. The test is, does the testimony tend to prove what the transaction was? *Owens* v. *Owens*, 14 W. Va. 95; *Anderson* v. *Cranmer*, opinion, 11 W. Va. 576; *Robinson* v. *James*, 29 W. Va. 224 (11 S. E. Rep. 920).

But this is not important. In addition, Thomas Samples has done acts utterly inconsistent with any idea that he owned one half the land, and consistent only with the theory—the true theory—that there was a deed of trust, under which the trustee sold on May 6, 1865, and it was purchased for the benefit of all the nine heirs by William Paxton, and Samples' wife was entitled to one ninth as an heir.

In this suit Samples and wife filed an answer fully recognizing the common ownership by all the heirs, alleging that Thomas Paxton had in his lifetime set apart to Mrs. Samples a specific lot of two hundred and twenty four acres out of the land, and placed her in possession, which she had held for twenty seven years; and praying they be confirmed in the separate ownership of the lot in the partition. Samples and wife both signed this answer. This answer, I see, too, definitely alleges that certain of the heirs had executed a deed conveying to Virginia Samples this lot, and exhibits it, and asks that this lot be confirmed to her. And this deed recites that the lot is part of the land to partition which this suit was brought, it being lot No. 5 in the one thousand four hundred acretract owned by the heirs of Thomas Paxton, deceased." And in 1882, Samples and his wife united with others in a deed conveying to America Simmons a specific defined lot, she being an heir, containing a recital that it was "lot No. 4 in the division of a survey of one thousand and four hundred acres, Thomas Paxton's land."

From these deeds and other evidence it appears that Thomas Paxton, regarding the land as virtually his, laid it into lots, and gave several children several holdings, and they lived on them, and made improvements, for more than a quarter of a century; and some of them died on them, and perhaps were there buried. Samples recognized this partition by his solemn deed. Samples asked no more for years and years. What malign influence moved him, in 1891, to ignore all he had done years ago by filing an answer denying the deed of trust, and claiming that he and George W. Paxton owned still the whole tract, and seeking to exclude other heirs from their just share in the common patrimony? What moved him in his evidence, while admitting that he had employed the attorney signing the first answer, to repudiate his work, and say he had not read the answer, or heard it read? Strange that the attorney should have inserted the details of claim to the specific lot, and ignored his client's ownership of half of this valuble land, without the assent of his client. And the various heirs paid taxes for a number of years from 1869 up, according to their interests in the land, Samples paying only on one share. And I notice that his second answer says that in 1883 he made a deed for a lot to another heir, William Paxton, as also one to Simmons and wife, but they were procured by fraud; but wherein the fraud was he does not inform us, contenting himself with mere generality.

The answers allege generally a want of consideration of the bonds. If that were true, it would affect the deed of trust; but George W. Paxton and Samples furnish the only evidence on this score—that they were accommodation bonds intended to secure a loan, but not used. They can not give this evidence against the dead man's estate. And besides other evidence of their declarations repels it. Thus on the merits the pretensions of George W. Paxton and Samples are without foundation and against justice. One reading the case is impressed with wonder that sensible men could present a case so filled with inconsistent acts, and so palpably untenable, and ask a court of justice to sustain it. Animadversion more severe might be made upon their conduct, but it would answer no purpose.

Counsel seeing that the substance is against his client, evidently relies with chief dependence upon the point that the answers of the defendants contain new matter calling for affirmative relief, and that as there was no special reply a decree giving them the whole land upon an unjust cause should have been rendered, taking away from brothers and sisters their shares confirmed by thirty years' possession, a possession so long that all have grown gray within it, and others have died, leaving children behind them. But this contention is not good. These answers are purely the common answers of defence or traverse of the matter of the bill, not cross bills. The bill alleges the execution of the bonds and deed of trust, and the sale under it, the purchase by one of the heirs for all, and thus states title of the parties entitling them to partition. The answers simply assert that the deed of trust was forged, so far as George W. Paxton is concerned, and procured by fraud, so far as Samples is concerned. This is merely matter of defence. It is not enough to call for a special reply that the answer contains new matter, but it is only when the new matter, in its nature as applied to the case, calls for affirmative relief against some of the parties, and it is not simply matter of defence of the case made by the plaintiff. *Smith* v. *Turley*, 32 W. Va. 14 (9 S. E. Rep. 46) and cases cited.

Now, what relief do these answers call for? Simply a denial of the partition, and dismissal of the bill. A dismissal would forever preclude the claim of plaintiff to the land under that title without cancellation. Who would say that under ordinary chancery practice, before the enactment of sections 35, 36, of chapter 125 of the Code, these defendants could not resist the plaintiffs' suit by an ordinary answer containing the matter contained in these answers? No one, I assume. Then these answers are to be regarded only answers of ordinary defence matter, and not as containing new matter calling for affirmative relief under said statute. I think *Cunningham* v. *Hedrick* (23 W. Va. 579) and the lucid opinion by Judge Johnson, will sustain this position. It holds that before said statute, while it was proper and in accordance with strict rules of pleading when a bill to en-

force a vendor's lien was filed, if the defendant wished to rescind the contract because the defendant was of unsound mind, or that it was procured by fraud, to fill a cross-bill, yet where the record showed that relief could as well be given upon bill, answer and proofs as if a cross-bill had been filed, its filing would be dispensed with, as it would be mere formality to file it; and that, under the operation of said statute, where the answer contains material allegations constituting a claim for affirmative relief, and no reply in writing is filed, but only a general replication, and the cause has been heard on the pleadings thus made and the proofs, if the record shows it is not such a case as would, before the statute, demand a cross-bill to give the defendant the relief sought, the decree will not be reversed because no reply in writing was filed.

In that case Hedrick purchased land, gave her bond, and a deed was made to her. She answered that she was incompetent from imbecility of mind to contract, and that the contract had been procured by fraud, and resisted the enforcement of the contract for that cause, and prayed rescission as in this case. If anything could give the cast to the answer of one calling for affirmative relief, it would be the prayer for rescission. But in the Cunningham-Hedrick case it was held that such relief could be given on an ordinary answer, and the answer did not call for a reply in writing, and the case could not be reversed for want of it. *Mettert* v. *Hagan*, 18 Gratt. 231, was a bill to recover an interest in an estate, and an answer was filed resisting relief on the ground that the party was incapable from drink of making the deed ; that it was procured by fraud ; and asking that it be declared null and void. That is just so in this case. It was held that, though strictly a cross-bill would have been proper, yet the answer might for that purpose be treated as such, and rescission granted. So the cases settle that in such case relief may be refused, and cancellation made on answer, and a cross-bill is not necessary. Now, we treat an answer as one under the statute calling for affirmative relief only where a cross-bill must be filed according to the chancery practice to get the relief sought in the answer, not to cases where it can be given on the answer.

Hence no reply was necessary. See, also, Bart. Ch. Pr. 304; *Kendrick* v. *Whitney*, 28 Gratt. 655.

There is another reason against reversal for want of such reply. After their answers were filed, the defendants went on to take depositions in support of them, and a hearing just as full and fair was had as if such reply had been filed. They treated it as if filed. Section 4, c. 134, Code, provides that "no decree shall be reversed for want of a replication to the answer where the defendant has taken depositions as if there had been a replication; nor shall a decree be reversed at the instance of a party who has taken depositions, for an informality in the proceedings when it appears that there was a full and fair hearing upon the merits, and that substantial justice has been done." Though the first clause does not apply to a special reply in writing, yet I think with Judge Johnson that the latter clause does, as he pointedly said, in *Cunningham* v. *Hedrick, supra.* In that case the court held a second point strictly applicable to this case—that where a defendant has taken depositions, and it appears that there has been a full, fair hearing upon the merits, and that substantial justice has been done, though there was informality in not requiring a plaintiff to file "a reply in writing," the decree will not be reversed for this reason.

There is still another reason why the want of a reply in writing can not matter. The only effect of the absence of such reply would be to take the facts in the answers to be true. Though true, yet the doctrine of laches would debar the relief the answers sought. The plaintiff entered a demurrer to these answers. If treated as cross-bills, a demurrer would lie to them, and raise the question of laches. *Whittaker* v. *Improvement Co.*, 34 W. Va. 217 (12 S. E. Rep. 507). Are these defendants chargeable with laches? They sought to rescind and cancel a deed of trust, a fully executed deed, for fraud. Samples knew of the fraudulent deed of trust March 3, 1865. George W. Paxton knew of it, he says, in 1880. They brought no suit until they filed these answers. This bill was filed in August, 1883. George W. Paxton filed an answer simply denying the deed of trust, charging no forgery, and asking no cancellation. In his

second answer (December, 1884) he still asks no rescission of the deed of trust, though he did of other instruments. In his third answer (May, 1891) he yet does not ask cancellation, though he does of other papers. If he has any answer at all calling for rescission, it is only under prayer of general relief. Samples never asked rescission of the deed of trust, or even denied it, until his second answer, as late as April, 1891, though he filed an answer before. George W. Paxton thus knew of the fraud and forgery, giving him the benefit of a prayer for annulment, more than four years, and Samples twenty six years, before they took a step to rid themselves of it. The law is that he who elects to set aside an instrument for fraud must sue without unreasonable delay after discovery of it, unless there be good reason to excuse it. *Whittaker* v. *Improvement Co.*, 34 W. Va. 217 (12 S. E. Rep. 507) and cases cited. This is particularly applicable to Samples, and I hardly think Samples has any answer of the character spoken of.

Counsel for appellees contend that there are no orders filing these answers. Technically there are not. Especially should there be leave to file amended answers, and it is the amended answers which are relied upon for relief to the defendants. But the order showing plaintiffs' demurrer to them treats them as filed, and the decree refers to them as read on the hearing, and I treat them as filed. And, as pertinent to this subject of laches, for the purpose of showing not simply laches, but, as a circumstance of great force, and decisive, to repel all idea that George W. Paxton and Samples had any claim to the whole of the land, and never, until very lately, thought of setting up any, they allowed their brothers and sisters for years—many years—to occupy, improve, and cultivate separate parcels, without rent, without claim. Why? Because they knew they had no right under their deed from Vinyard, but that the land belonged to all the heirs. They knew there had been a voluntary partition into lots, and that these other heirs were holding under it—a laying off into lots by their old father, who died as long ago as 1862, and which all recognized until these defendants sought to upset it of late years. George W. knew he had sold his

interest to his brother Hays in 1874. Samples knew he had no interest save that under his wife. It was only of late years that he and Samples formed a combination to claim all. Their right is barred by reason of the separate claim for so many years, and possession and improvement by the other heirs, if George W. Paxton and Samples ever had any such right as they claim latterly.

The appellants complain that no notice of sale under the trust was given them. It required no notice to them but notice in a newspaper, which was given.

It follows, as the deed of trust was valid, the sale and conveyance by the trustee are valid. Nothing is shown against them. The deed from the trustee to the heirs, in which William Paxton joined, recited that he, as administrator, had purchased for the benefit of the heirs. He was one. The purchase was made, likely, to save the estate to the heirs, and with it the debt, William Paxton, acting as administrator, prudently presumably, and honestly conveyed to all the heirs. As they had owned the debt for weal or woe, so he secured the land for weal or woe to them. We must presume he acted prudently. Not one iota is shown to the reverse. And to end any objection on this score, all the heirs, including George W. Paxton and Samples and wife, have by deeds and words ratified the act. And would any court of equity, after a quarter of a century of possession under it, now permit one heir to come in and say the administrator had no power to purchase and convey to the others? They should have protested sooner.

The assignment of error that the court heard the case on a special reply found in the record, but not appearing in any way ever to have been filed, is not well taken, because it is not mentioned as one of the papers read; though for reasons above given this is immaterial.

I scarcely know whether I should advert to the act of the court in excluding George W. Paxton from the partition, as no error is assigned for that cause. This exclusion was proper. By deed of October 14, 1874, George W. Paxton conveyed his right in the land to his brother Hays A. Paxton. He acknowledged the deed, and, as he admits, he delivered it to the grantee. He states that he delivered

it on condition that, if a horse—a part of the consideration —should not be delivered in a certain time, the deed was to be surrendered; and that the horse was not delivered, and the deed was surrendered. The deed is found in George W. Paxton's possession, which would lend some countenance to this pretention; but we must exclude this evidence, as Hays A. Paxton's lips have mouldered in death, and he can not speak his version. The deed is found in George W. Paxton's possession. Was it ever redelivered? Amanda E. Parks says she saw the deed written in Wirt county. It was there acknowledged. She says she saw it in the hands of Hays A. Paxton, the grantee, a year or two after it was made. A witness (Whitney) says he saw a letter in the possession of Hays A. Paxton from George W. Paxton, admitting he had sold him the land, and to so tell one Elmore. Whitney next saw this letter in the papers of the case, and later he saw it in the hands of George W. Paxton. Whitney told him he would have to put it back, when George W. Paxton said, "By ——, it would defeat him, if he put it back without the balance of the letter." I should have before stated that the witness Parks states that George W. Paxton came to Hays A. Paxton to borrow the said deed until "he got through with Billy," and Hays Paxton loaned him the deed. A circumstance against George W. Paxton's claim, and corroborating Parks, is that George W. Paxton yet held Hays A. Paxton's bond, which is part of the consideration. If there had been a surrender of the deed, why would George W. Paxton still have the obligation? A witness (King) states that he heard George W. Paxton state on a trial before a justice that he had sold all his interest in the land to Hays A. Paxton. A witness (Copin) states that just before this suit was brought he asked George W. Paxton if he had not an interest in land in Clay county, and he replied that he had none, but had sold it all to Hays A. Paxton. Nothing to the reverse is shown. The Circuit Court decided properly that George W. Paxton had passed his share to Hays A. Paxton. And, more surely yet, we can not undertake to say that on this question of fact the finding is wrong, plainly.

As to the deeds between other heirs which were attacked,

George W. Paxton and Samples only claim that they should be annulled because they owned all the land, and other heirs who made those deeds owned none; but, as we find that George W. Paxton and Samples had not such right, we need say no more as to those deeds.

The point that there was no revival against the heirs of America Simmons is not ground for reversal. The bill conceded her right to a share. So did the appellants, if not entitled to the whole. Her heirship was a concession, and how does it prejudice appellants? Her heirs were accorded a share. The appellants are not entitled either to the whole or shares.

As to the point that there was no revival as to heirs of G. W. Paxton. How does it prejudice appellants? But in fact there was such revival, the order calling the heirs heirs of A. J. instead of G. J. Paxton— a mere misnomer as to one initial.

As to the point that heirs of John Paxton, Lyle Paxton, and Caroline Burdette were not parties. They had no interest. The bill charged that they had before suit conveyed their interest by deed to Hays Paxton. George W. Paxton's answers conceded it, and Samples did not deny it. Not one of these points are assigned for error.

Decree affirmed.